718 P.2d 283

**Thomas Henry GIBSON,
Petitioner-Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 15866.

Supreme Court of Idaho.

March 25, 1986.

Rehearing Denied May 29, 1986.

Charles B. Lempesis and Anthony M. Sanchez (argued), Post Falls, Paul J. Dayton, Bryan P. Coluccio, Christopher R. Osborn and Maureen T. Lee, Seattle, Wash., for petitioner-appellant.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen. (argued), Boise, for respondent.

BISTLINE, Justice.

## HISTORY

Appellant Gibson, having been convicted of murder and having exhausted his rights to appeal, petitioned the district court for post-conviction relief. The state moved for summary judgment, which the district court granted. Raising numerous arguments, Gibson seeks reversal of summary judgment.

The facts surrounding the murder for which Gibson is charged are summarized in *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1984). Of particular concern here is the controversy over the state's jurisdiction, which hinged on whether Kimberly Palmer was killed in Idaho. This Court noted:

> At trial, a major issue was raised concerning Idaho's jurisdiction over Gibson and, therefore, much of the State's case consisted of autopsy evidence which showed that the varying state of body decomposition indicated that Currier had been killed some hours before Palmer, and water in Palmer's lungs indicated that Palmer had actually been killed in the streambed in Idaho. That evidence, of course, contradicted the testimony of Gibson that Palmer had been killed in the Paradis' residence in the State of Washington. *Id.* at 57, 675 P.2d at 36.

Relevant to his petition of post-conviction relief, Gibson enumerates the following additional facts. Palmer's body was cremated two days after Gibson was charged and provided with counsel. Gibson's counsel did not arrange for an independent examination of that body before its destruction. The autopsy report of the state's forensic pathologist, Dr. William Brady, contained no results of tests to identify the liquid

found in Palmer's lungs. In addition, none of this liquid was preserved. Finally, Dr. Brady did not examine the body for evidence of lividity (pooling of bodily fluids); nor did he examine the abrasions or lacerations to determine whether they were inflicted before or after death.

Gibson's trial counsel was aware of the jurisdictional issue, had a copy of the autopsy report, and was aware that Dr. Brady would testify. Counsel did not call an expert witness to contest Dr. Brady's findings.

Gibson's trial counsel did call Gibson to rebut the state's evidence that the killing occurred in Idaho. However, on the day of his testimony, Gibson ingested drugs which rendered him disoriented and drowsy.

### ISSUES RAISED BY GIBSON

In the companion case to this one, *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306, 1308–1309 (1986), we discussed the standard of review of summary judgments and petitions for post-conviction relief. With that as background, we discuss each of the issues raised by Gibson.

A. *The Destruction of Potentially Exculpatory Evidence.*

■ Gibson claims the state violated his rights to due process under Idaho Constitution, Article 1, § 13 and the Fourteenth Amendment of the federal Constitution by permitting the cremation of Palmer's body before Gibson's counsel could arrange for an independent examination. The state is constrained in disposing of potentially exculpatory evidence. *See California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). As we explain in *Paradis, supra*, 110 Idaho pp. 537–540, 716 P.2d pp. 1309–1312 (where precisely the same argument under the same facts was made), exculpatory evidence is evidence which clears or tends to clear an accused person from alleged guilt, or excuses that person. Since the body held evidence allegedly relating to only the jurisdictional question and not to questions of guilt, or excuse, the body did not constitute exculpatory evidence. Accordingly, its destruction did not constitute a violation of Gibson's due process right to have access to potentially exculpatory evidence.

■ We also hold that the destruction of the body did not violate Gibson's due process right to have access to evidence on jurisdiction. Again, as explained in *Paradis, supra*, 110 Idaho pp. 540–543, 716 P.2d pp. 1312–1315, and as briefly discussed below, (1) the body was not sufficiently material to the question of jurisdiction, (2) the body's cremation was not prejudicial to Gibson on the jurisdictional issue, and (3) the state did not act in bad faith when it permitted the cremation.

As for materiality, at best the body might have held evidence that the killing took place earlier in time than Dr. Brady found, which might have corroborated Gibson's testimony that Palmer was killed in Washington. Even if a more complete autopsy would have revealed that Palmer was killed some hours earlier, the killing still could have occurred in Idaho as easily as in Washington. This alleged connection is too tenuous and attenuated from the question of jurisdiction for the alleged evidence of the body to have made any impact.

Aside from Dr. Brady's testimony, the state offered as evidence of jurisdiction the location of the body's discovery and the circumstances in which it was discovered. *See* discussion *infra* at B.3. Since Dr. Brady's autopsy and testimony were not essential to the state's case on jurisdiction, Gibson was not prejudiced by the destruction of evidence which might have aided in his rebuttal of Dr. Brady's evidence. In any event, the lack of materiality of the evidence makes its destruction inherently nonprejudicial. The evidence of the body simply offered little to aid Gibson's defense.

Finally, there is not even a suggestion that the state acted in bad faith when it permitted the cremation. The state had performed an autopsy and had no way of foreseeing either a defense of lack of jurisdiction or a connection between the body

and such a defense. Thus, Gibson's due process claim related to the destruction of the body fails as a matter of law.

B. *Effective Assistance of Counsel.*

Gibson argues he was denied effective assistance of counsel at the trial, pre-sentencing and sentencing stages in violation of the Sixth Amendment "assistance of counsel" clause, applied to the states via the Fourteenth Amendment due process clause, and in violation of the right to counsel clause of Article 1, § 13 of the Idaho Constitution.

1. *The Right to Effective Assistance of Counsel under the Federal Constitution.*

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court comprehensively discussed the right to effective counsel and the appropriate standard "for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective." *Id.* 104 S.Ct. at 2056. For the Sixth Amendment guarantee of counsel to have any meaning, that counsel must be more than merely present; rather, counsel must render *effective* assistance. *Id.* at 2063–64. Otherwise, the defendant's trial may lack the adversarial testing required to insure a full and fair result. *Id.* at 2063. "The benchmark," observed the Court, "for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 2064.

The Court recognized two components necessary to a criminal defendant's claim of ineffective assistance of counsel:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Id.*

Regarding the first component, the Court found "[t]he proper measure of attorney performance" to be "reasonableness under prevailing professional norms." *Id.* at 2065. The criminal defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Id.* at 2066. Because of the potential distortion inherent in hindsight and the temptation to second-guess the decisions and actions in what later proved a losing effort, the process of assessing counsel's performance as a whole must be tempered by a presumption "that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.*

Regarding the second component, the Court initially observed that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 2067. Prejudice is presumed in some circumstances, including where the defendant is actually or constructively denied counsel altogether and where counsel actively represents a conflicting interest. *Id.* In other circumstances, the defendant must affirmatively prove prejudice. *Id.* This requires a showing that:

[T]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 2068.

"In making this determination," the Court concluded, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 2069.

### 2. *The Right to Effective Assistance of Counsel Under the Idaho Constitution.*

In *State v. Tucker,* 97 Idaho 4, 539 P.2d 556 (1975), this Court held that Article 1, § 13 of the Idaho Constitution assured criminal defendants of "reasonably competent assistance of counsel." *Id.* at 8, 539 P.2d at 560. As the beginning point to this inquiry, this Court recognized the American Bar Association's standards entitled "The Defense Function." *Id.* at 9, 539 P.2d at 561. Strategic and tactical choices should not be second-guessed; however, the Court observed, "when counsel's trial strategy decisions are made upon the basis of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation, the defendant may well have been denied the competent assistance of counsel." *Id.* at 10, 539 P.2d at 562; *see also State v. Kraft,* 96 Idaho 901, 905, 539 P.2d 254, 258 (1975). "Factual questions relating to the competency of counsel generally pose a dilemma for an appellate court attempting to review the record;" in such circumstances a hearing usually is required. *Tucker, supra,* 97 Idaho at 12, 539 P.2d at 564; *see also Kraft, supra,* 96 Idaho at 906, 539 P.2d at 259 (Bakes, J., concurring specially) ("The question of competency of counsel is an extremely complex factual determination which, in all but the most unusual cases, requires an evidentiary hearing for determination.").

To sustain a reversal of the conviction on the grounds of ineffective assistance of counsel, the defendant also must show "that the conduct of counsel contributed to the conviction or to the sentence imposed." *Tucker, supra,* 97 Idaho at 12, 539 P.2d at 564; *see also Kraft, supra,* 96 Idaho at 906, 539 P.2d at 258.

A superficial comparison between the standards discussed in the above cases and the federal standard reveals considerable similarity. Despite this similarity, we are aware that the Idaho Constitution potentially can be read to afford a broader right to effective counsel than does the federal Constitution. *State v. Newman,* 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985). However, neither this case nor its companion *Paradis, supra,* require us to define the difference if any between the federal and state guarantees. As explained below, Gibson has failed to make a *prima facie* case that he was prejudiced in any way by the ineffectiveness he assigns to his trial counsel.

### 3. *Gibson's Argument that He Received Ineffective Assistance of Counsel Examined.*

Gibson alleges a great number of failings on the part of his trial counsel, all of which relate to the jurisdictional issue. Gibson suggests that trial counsel should have known that the jurisdictional issue would be critical. Despite this, Gibson continues, trial counsel (1) failed to call forensic pathologists to attack Dr. Brady's inadequate and incomplete autopsy and testimony, (2) failed to have examined the body tissues which Dr. Brady had retained from Palmer's body, (3) failed to consult with forensic pathologists to aid his cross-examination of Dr. Brady, (4) failed to give adequate attention to the matters of posterior lividity and needling of the vitrus humor of the eye to determine time of death, (5) failed to cross-examine Dr. Brady on the value of examining abrasions and lacerations to determine whether they occurred before or after death, (6) failed to locate Roxeanna Moline, who had critical information on the manner and location of the death of Palmer, (7) pressured Gibson against his will into testifying on the circumstances and location of the killing without warning or preparing him, and without inquiring into his condition on the day of his testimony, and (8) erred in relying on Gibson's testimony concerning the location of the killing, despite Gibson's obvious lack of credibility in the eyes of the jury. Gibson asserts in conclu-

sory fashion that "[t]here can be no doubt that but for trial counsel's foibles the result of the trial would have been different." Appellant's Brief, p. 24. Presumably, Gibson believes the jury would have found that the killing occurred in Washington rather than Idaho.

Because we choose to address the question of prejudice without first addressing the question of whether Gibson's trial counsel rendered reasonably effective assistance, we will assume for the moment that Gibson's allegations as to ineffectiveness are well founded. Thus, we will assume that trial counsel should have called forensic pathologists to attack Dr. Brady's testimony, that trial counsel could have better prepared for and conducted his cross-examination of Dr. Brady, that trial counsel could have located and called Moline as a witness, and trial counsel should not have called Gibson as a witness. Because we are reviewing a summary judgment, we can uphold the decision of the district court on the grounds that Gibson was not prejudiced by the alleged ineffective assistance only if we find there to be no substantial dispute as to the location of the killing, even assuming all of the above.

Gibson submitted affidavits from two forensic pathologists, Drs. Faith and Gross, which criticize Dr. Brady's autopsy and medical conclusions. Together with more effective cross-examination, Gibson's trial counsel at best could have discredited Dr. Brady's testimony. However, the state offered other physical evidence that the killing had occurred in Idaho. The evidence Gibson now suggests should have been submitted neither contradicts that physical evidence indicating Idaho as the murder scene, nor suggests in any appreciable way that Washington was the murder scene.

■ The body of Palmer was found in Idaho. This creates an inference that she died in Idaho. *See State v. Needs,* 99 Idaho 883, 885, 591 P.2d 130, 132 (1979).

The condition and location of the body further serve to confirm the inference. Her body was found 52 feet from the overturned van, down a steep hillside and be-yond a barbed wire fence. The body was nude from the waist up, but otherwise clad in jeans and shoes. A halter top was found beneath the upper torso. The jeans were unzipped and were torn in the area of the left buttocks. Using these undisputed facts, the state theorized that Palmer had been alive when taken to Idaho, had attempted to flee down the hill once the van turned over, had torn her jeans as she climbed over the fence, but had been caught near the creek. In the ensuing struggle her halter top had been pulled off. The struggle culminated with Palmer being strangled to death along that creek in Idaho. These facts also serve to refute Gibson's contention that the killing had occurred in Washington, followed by transport of the body to Idaho. The jury could have found it unlikely that the killers would dump one body, contained in a sleeping bag, just down the hill from the van, but would remove the other body from a sleeping bag, carry it down the hill and over a barbed wire fence, and then leave the body face down in a streambed.

In the face of this evidence, Gibson has none of his own to put into issue the location of the killing. In their affidavits, Drs. Faith and Gross criticize Dr. Brady's autopsy and medical conclusions based on the autopsy; however, neither offered affirmative evidence of the killing taking place elsewhere.

■ The testimony of Roseanna Moline would not raise significant questions about the location of the killing. At the hearing on Paradis' motion for a new trial, Moline testified that she saw Palmer on the kitchen floor of the Paradis residence in Washington in *either* an unconscious *or* deceased condition. In other words, her testimony was inconclusive.

In addition, her testimony as to the time of the events she witnessed was in conflict with the testimony of others. She claimed to have seen Gibson in the act of sexual relations with the either dead or unconscious Palmer at the Paradis residence in Washington at just prior to 7:00 a.m.

However, trial witnesses testified to having seen Gibson, Paradis, and Evans (a third accomplice) near the place in Idaho where the bodies of Palmer and Currier were found at approximately 6:45 a.m. the same morning. Two officers testified to having seen the three at Rob's Drive-In in Post Falls, Idaho, at 8:00 a.m. the same morning. Thus, not only was Moline's testimony inconclusive, it also lacked credibility. Her testimony does not appreciably shake the evidence pointing to Idaho being the locus of the killing.

■ At his trial, Gibson's only affirmative evidence that Washington was the locus of the killing was his own testimony to that effect. However, Gibson now asserts that his counsel rendered ineffective assistance by inducing him to testify. Gibson points not only to his drugged state on the day of his testimony, but also to his lack of credibility and believability. Since Gibson believes he should not have testified, he necessarily prevents himself from arguing that his testimony would have persuaded the jury. We must accept his argument that he should not have testified, and examine whether in its absence the jury would have found that the killing occurred in Washington. Even if we did take into account Gibson's testimony, Gibson hardly can claim on the one hand that his testimony about the place of the killing was so unpersuasive and unbelievable that the jury must have rejected it, and on the other that his testimony constituted sufficient evidence to turn the issue of the location of the death into a disputed one.

Ignoring Dr. Brady's testimony, the record contains sufficient evidence for the jury to conclude that the killing of Palmer occurred in Idaho. The record, augmented for present purposes by the testimony of Gibson's current expert witnesses and of Moline, contains no affirmative evidence to indicate any other locale. Since the steps Gibson now argues trial counsel should have taken would not have created a serious question of fact as to jurisdiction, Gibson was not prejudiced by their omission. Considering the "totality of the evidence before the judge and jury," we discern no "probability that, but for counsel's [alleged] unprofessional errors, the result would have been different." *Strickland, supra,* 104 S.Ct. at 2068–69. We hold that Gibson was not prejudiced by the ineffective assistance of counsel he alleges. As a consequence, his claim of ineffective assistance of counsel fails.

## C. *Sufficiency of State's Evidence Concerning Jurisdiction.*

■ In order to demonstrate that the alleged incompetency of his trial counsel and the destruction of the body prejudiced him, Gibson asserts that the state's medical evidence relating to the location of the killing was "contestable." Apparently Gibson's point is that the jurisdictional issue might have swung his way had the body not been destroyed, or had his counsel more effectively attacked the state's evidence. Gibson attaches no argument to this discussion of the medical evidence separate from his allegations related to his destruction of evidence and ineffectiveness of counsel arguments. We already have explained and held that Gibson was not prejudiced by the destruction of the body or by the alleged incompetency of counsel.

Conceivably Gibson might have intended this as a separate allegation that the state failed to produce sufficient evidence on which the jury could find jurisdiction in Idaho. This would be an allegation that "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice...." I.C. § 19–4901(a)(4). However, as discussed in the preceding section, Gibson fails to offer any new, affirmative evidence of his own to indicate Washington as the place of killing. Consequently, Gibson fails to demonstrate the existence of *"material* facts, not previously presented and heard...." *Id.* (emphasis added). Also as discussed in the preceding section, the state offered not only the testimony and findings of Dr. Brady, but also the evidence of the body's location and of the circumstances in which

the body was discovered to establish Idaho as the locus of the killing. Clearly the jury had sufficient evidence on which to base a finding that the killing occurred in Idaho.[1]

### D. Issues Previously Raised on Direct Appeal.

■ Without submitting any additional evidence, Gibson raises as error several issues that were decided in his first, direct appeal to this Court. He argues: (1) that admitting evidence of the murder of Currier subjected him to double jeopardy, (2) that he was constitutionally entitled to have a jury participate in the sentencing process, and (3) that there was insufficient evidence to support the statutory aggravating factor found by the trial court. Since this Court finally decided these issues on direct appeal, its decision now operates as *res judicata. Kraft v. State*, 100 Idaho 671, 674, 603 P.2d 1005, 1008 (1979). A majority of this Court declines Gibson's invitation to change its decision on these issues.[2]

### E. The Constitutionality of I.C. § 19–2515(g)(6).

■ I.C. § 19–2515(g)(6) establishes the following as an aggravating factor in capital sentencing: "By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." Gibson suggests that § 19–2515(g)(6) is unconstitutionally vague. A majority of this Court previously has held otherwise, *see State v. Aragon*, 107 Idaho 358, 367, 690 P.2d 293, 302 (1984), and declines to change its decision.[3]

### F. The Psychiatric Testimony.

■ A psychiatrist was appointed to evaluate Gibson as a part of the presentence investigation. Gibson claims he was not advised of his right to remain silent, or that his statements might be used at sentencing. Gibson argues this violated his right against self-incrimination under the United States Constitution and Idaho Constitution, Article 1, § 13.

To support his claim under the federal constitution, Gibson relies on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which the Supreme Court held that a psychiatric opinion could not be admitted against the defendant at the sentencing phase unless the defendant had been advised of his or her rights against self-incrimination and had waived these rights. *Id.* at 469, 101 S.Ct. at 1876. But in *Smith*, the psychiatric testimony was used to establish the defendant's future dangerousness as an indispensable element of the aggravating circumstances which were the basis of the imposition of the death penalty. *Id.* at 466, 101 S.Ct. at 1874. Here, to the contrary, the psychiatric testimony formed no part of the finding of aggravating circumstances. In fact, the psychiatrist testified for the defense at the mitigation-aggravation hearing, not for the state. Since Gibson's statements were not offered by the state as evidence against him of an aggravating factor, his rights against self-incrimination were not violated under either the federal or Idaho constitutions.

■ Even if there was a question about Gibson's right against self-incrimination being violated, Gibson made no objection to the psychiatric opinion being offered, and went so far as to call the psychiatrist to testify in his behalf. In the process Gibson effectively waived any rights against self-incrimination associated with the psychiatric report and testimony.

---

1. The state argued that this issue was raised in Gibson's prior appeal to this Court. The state concludes the matter is *res judicata*. However, while referring to *State v. Gibson* by name, the state cites in its brief to the *Paradis* case by number. The state apparently confused the two cases. Unlike Paradis, Gibson had not previously raised the question of sufficiency of evidence.

2. This writer continues to adhere to the views expressed in his dissent to *Gibson, supra.*

3. This writer continues to adhere to the views expressed in his opinion submitted with *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985).

Finally, since the record indicates that the trial judge did not rely on the psychiatric report to establish any aggravating factors, any error committed by admitting that report was harmless.

### CONCLUSION

We concur with the able district court (Judge Cogswell) that Gibson raises no genuine issues of material fact and that the state of Idaho is entitled to judgment as a matter of law. The decision of the district court is affirmed.

DONALDSON, C.J., and SHEPARD and HUNTLEY, JJ., concur.

BAKES, J., concurs in part B.1. and concurs in the result in part B.2.